IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2001 Session

## STATE OF TENNESSEE v. TERRY LEE ROBINSON

**Appeal from the Criminal Court for Davidson County**
**No. 98-B-1539     Cheryl A. Blackburn, Judge**

———————————

**No. M2000-00995-CCA-MR3-CD - Filed October 25, 2001**

———————————

The defendant, Terry Lee Robinson, appeals from his conviction by a jury for first degree murder, for which he was sentenced to life imprisonment. He contends that (1) the evidence was insufficient, (2) the trial court erroneously prohibited a defense expert from testifying as to the victim's cause of death, (3) the trial court admitted evidence of the defendant's prior conduct in violation of Tenn. R. Evid. 404(b), (4) he was denied a fair trial because the jury was composed of ten women and two men, and (5) he was denied a fair trial because a television movie about a man fatally poisoning his wife with cyanide aired during the trial. Although we hold that the trial court erred regarding the defendant's expert and the prior conduct evidence, we conclude the errors were harmless. We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Edward J. Gross, Nashville, Tennessee, for the appellant, Terry Lee Robinson.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the December 1997 death of Lenora Robinson, the defendant's thirty-three-year-old wife. The victim's mother, Charlie York, testified that the victim and defendant married on September 1, 1989. She said that the couple did not have children together, but the defendant's young daughter, Brittney, lived with them. She stated that before the marriage, the defendant had worked for an exterminating company and some collection agencies. Mrs. York

-1-

testified that in April 1996, the victim and the defendant started their own collection agency. She said that the victim confided to her that the couple had serious financial problems. Mrs. York said that in the months before her daughter's death, the victim revealed that she and the defendant were heavily in debt and that the defendant wanted to file bankruptcy. She said that while most of the couple's credit cards were in the victim's name, the victim did not want to file bankruptcy because it would ruin her credit. Mrs. York testified that in addition to financial problems, the victim and the defendant were having sexual problems, and the victim was not happy in the marriage. Mrs. York stated that the defendant acted distant during the month of December 1997.

Mrs. York testified that the victim started feeling sick on Friday, December 19, 1997. She said that although the victim was ill, on Sunday, December 21, the victim fixed Christmas dinner at the victim's home for her father and stepmother. Mrs. York said that later that evening, she called to check on her daughter, but the victim was too weak to talk on the telephone. She stated that the next morning, the victim called Mrs. York and told her that she had been sick all night. Mrs. York said she went over to the victim's house, told the victim that she had to see a doctor, and suggested that they go to the emergency room. Mrs. York testified that although she agreed to see a doctor, the victim said the defendant wanted her to go to Baptist Centra Care instead of the hospital. Mrs. York said that she and the defendant took the victim to Baptist.

Mrs. York testified that a Baptist Centra Care doctor diagnosed the victim with viral syndrome, gave her a Phenergan shot to alleviate nausea, and gave her three prescriptions to fill. She said that the doctor did not refer the victim to a hospital and that she and the defendant took the victim home. She stated that she stayed with her daughter all day, cleaning the bathroom and bed linens from where the victim had been sick the night before. She said that the victim slept all day and that the defendant ran errands and was in and out of the house. Mrs. York said that she went home about 4:30 p.m., but she forgot her cell phone and returned to the victim's home to get it. She testified that she also took the defendant's daughter home with her. Mrs. York stated that when she left, the victim and the defendant were alone in the house. She said that she called the defendant about 10:00 p.m. to check on the victim.

Mrs. York testified that early the next morning, December 23, 1997, the defendant telephoned and told her, "Charlie, I think we've lost her." Mrs. York said that she screamed and went over to the defendant's house. She stated that the police and an ambulance were there. She said that she went into the victim's bedroom, where medical technicians were working on the body, and saw that the victim had a brown substance coming out of her nose that had not been present the night before. She stated that the defendant was present and dressed in his pajamas.

Mrs. York testified that after the victim's body was removed from the house, she talked to the defendant about funeral arrangements. She said that they agreed that she would contact a funeral director and that she asked the defendant what type of service he wanted. Mrs. York stated that the defendant said that he did not want religion or music at the funeral and wanted only a graveside service. She stated that although the defendant wanted to bury the victim the next day, he agreed to wait until December 26 to give the victim's sister time to travel to Nashville. She said that after the

funeral, the defendant did not seem to want anyone in his house. She stated that if anyone brought food to his house, he told them to take it to her home. She said that if she fixed him a meal, he would either pick it up or meet her at the front door and take it. Mrs. York stated that she never saw the defendant grieve. She said that she talked with Detective E. J. Bernard of the Nashville Metropolitan Police Department and that she knew the police were investigating the victim's death. She testified that her husband continued to have contact with the defendant. She stated that the victim was about five feet five inches tall, weighed one hundred fifty pounds, smoked one to two packs of cigarettes a day, and occasionally drank beer.

Ken York, the victim's stepfather, gave testimony about the victim's death that was substantially similar to Charlie York's testimony. In addition, he testified that the victim and the defendant had a stormy marriage. He said that the defendant told him that the victim was difficult to live with and that it was impossible to get along with her. Mr. York stated that the defendant did not stay gainfully employed and that he and Mrs. York loaned the defendant and the victim money on several occasions. He said they most recently loaned the defendant and the victim money for a new car. He said the car and most of the credit cards were in the victim's name. Mr. York stated that in the fall of 1997, the victim began pressuring the defendant to get a job and help her with the bills and that their marriage rapidly deteriorated.

Mr. York testified that he and Mrs. York were close to the victim and the defendant and that the two couples saw each other several times a week. He said that soon after the victim's death, Detective Bernard of the Nashville Metropolitan Police Department told him the police were investigating the victim's death as a homicide. Mr. York stated that even though he knew the police were going to arrest the defendant, he remained the defendant's close friend. He said that the defendant told him that he had not had sex with the victim since early December and had a great need for sex. Mr. York said that the defendant told him that he had sex with other women in November and December 1997 and that he had sex with a woman on January 23, 1998, in the marital bed. Mr. York stated that once the defendant learned that he was under investigation, he asked Mr. York to help convince Mrs. York and the victim's father to agree to a plea bargain.

Bob Williams, the victim's father, testified that his new wife was close to the victim. He said that on Sunday, December 21, 1997, they went to the victim's house for Christmas dinner, which the victim cooked but was too sick to eat. He said that he heard of his daughter's death the morning of December 23 and that when he went to the house, the defendant was upset. He acknowledged that diabetes ran in his family and that his daughter, Theresa, had it.

Theresa Mettlen, the victim's sister, testified that although she was not close to the defendant, she stayed at his house while her family was in Nashville for the victim's funeral. She did not believe that the defendant seemed very upset. She said that one night after the funeral, while she and her husband were watching television with the defendant, he told them about his sex life with his second wife, Brittney's mother. Mrs. Mettlen said that she thought this was odd considering that the victim had just passed away. On cross-examination, Mrs. Mettlen admitted that the conversation started when she told the defendant that she had found her husband's "little black book." She said

the defendant told her that the victim had found his little black book, too, and he then continued with the conversation about his ex-wife.

Dr. Bradley Rudge testified that he is a physician at Baptist Centra Care and saw the victim on December 22, 1997. He said the victim complained of headache, cough, nausea, vomiting, and body aches. He said her lungs were clear and her respiratory rate was normal. He said he diagnosed her with viral syndrome, gave her a Phenergan shot for nausea, and prescribed some medications. Dr. Rudge said that he refers patients to specialists if necessary or calls an ambulance if a patient is acutely ill, but that he did not refer the victim to the emergency room because he did not think that her life was in jeopardy.

Detective E. J. Bernard of the Nashville Metropolitan Police Department, Homicide Division, testified as follows: A patrol officer called him to the defendant's home on the morning of December 23, 1997. When he arrived, medical personnel and the victim's family were present. Detective Bernard went to the victim's bedroom and saw her lying in bed. The body had no visible signs of injury, but the victim had a brown substance coming out of her nose and mouth. Years before, Detective Bernard had seen a similar substance coming out of the nose and mouth of a cyanide-poisoning victim. Family members told Detective Bernard that the victim had been sick with flu-like symptoms the day before and that she had been to Baptist Centra Care for treatment. The defendant told the detective that he had slept in another bedroom and had checked on his wife during the night; but, when he got up that morning, she was dead. The defendant was dressed in pajamas, his hair was mussed, and his face was clean but unshaved. Detective Bernard saw no signs of forced entry to the house, and he did not search or secure the premises. He walked through the home to see if he could find medications or narcotics that could have caused the victim's death, but he found none. He did, however, find a letter that the defendant had written to the victim sometime before her death. During the autopsy, Detective Bernard detected a sweet smell coming from the body, and he requested that the doctor test for cyanide. On January 12, 1998, Dr. Emily Ward, who performed the autopsy, told him that the victim's blood tested positive for cyanide. On January 28, 1998, Detective Bernard searched the defendant's home and collected more letters and documents. During a second search of the defendant's home in February, Detective Bernard collected various items and sent them to the Tennessee Bureau of Investigation (TBI) crime lab for cyanide testing. During his investigation, Detective Bernard also looked for places that sell cyanide in middle Tennessee. While he found numerous places that sell cyanide or products that contain cyanide, he determined that most places did not keep records of who bought it.

Detective Bernard read into evidence three letters that he collected from the house. In the first, undated letter that the detective collected on the day of the victim's death, the defendant told the victim that he loved her but also wrote, "[It's] been my experience when the sex is gone pretty much everything else is also." In the second, undated letter, the victim said that she would leave the defendant and wrote, "We are in a terrible situation." In the final letter, dated August 3, 1997, the victim told the defendant that they could divorce if the defendant could find a way to afford it because "I WILL NOT BE CHEAP!!!!!!!" On cross-examination, Detective Bernard acknowledged that when he told the defendant that a partial autopsy would be done, it was possible that the defendant requested a full autopsy and that although the detective obtained two search warrants, the

defendant allowed him to search his house and car without serving them. He said the defendant was cooperative and came downtown when the detective requested.

Agent Louis Kuykendall, a forensic toxicology expert, testified for the state as follows: He is a special agent with the TBI Crime Laboratory and has had training dealing with cyanide. Cyanide is present everywhere in small amounts, including the body. It can enter the body by inhalation as a gas, absorption through the skin, and ingestion. To form cyanide gas, which is very toxic, cyanide powder must be mixed with an acid. This acid is simple to obtain and can come from many sources such as car batteries, drain cleaner, and jewelry cleaner. It is easy to make cyanide gas, and a gas mask will protect anyone who comes into contact with it. Although the average person could not obtain cyanide, it was commonly used in the exterminating business, especially in the 1960's and 1970's. Cyanide will remain good as long as it is kept in a tightly sealed container. Although most people cannot smell cyanide, about thirty percent of the population smells it as bitter almonds. In early 1998, Detective Bernard contacted Agent Kuykendall and told him about a suspected cyanide-poisoning case. He told the detective to look in the victim's home for certain liquids and chemicals that could contain cyanide. Detective Bernard searched the defendant's home and collected various items, including liquid from a pickle jar, green liquid from a Gatorade bottle, jewelry cleaner, and pills. All of the items tested negative for cyanide.

Andrew Dykeman testified as follows: He is a forensic technician at the Davidson County Medical Examiner's Office and assisted Dr. Ward with the victim's autopsy. During the autopsy, he smelled a sweet, almond-cherry-like odor that he had never smelled before. He did not smell anything bitter. Samples taken from the victim's body were sealed in a bag, and a courier took them directly to Aegis Laboratories.

Dr. Tim Robert, a forensic toxicology expert, testified for the state as follows: He is the Assistant Laboratory Director at Aegis Analytical Laboratories, a small, private testing facility that specializes in forensic analysis. It received the victim's urine, blood, and inner eye fluid for routine tests, and on December 24, 1997, sent the fluids to MedTox Laboratories for cyanide testing. Aegis did not receive any tissue samples. MedTox reported that the blood specimen contained greater than two micrograms per milliliter of cyanide. The medical examiner's office then requested that the blood be retested for cyanide. MedTox did not have a sufficient blood sample for the second test, so Aegis sent MedTox another blood tube on January 14, 1998. The second test reflected one microgram per milliliter of cyanide. Although the blood samples were drawn from the victim at the same time, the differences in the amounts of cyanide did not surprise Dr. Robert because cyanide is unstable in biological samples and can decompose. In addition, MedTox tested a stained pillowcase, the victim's gastric contents, and several liquids that had been taken from the residence. All were negative for cyanide. Dr. Robert also reported several chain of custody errors in the samples that Aegis sent to MedTox. However, none of the errors affected the accuracy of the tests or the results. On cross-examination, he said that the best way to detect cyanide is to test tissue samples, not blood.

Dr. Harry McCoy testified as a toxicology expert as follows: He is the Laboratory Director for MedTox Laboratories in St. Paul, Minnesota. MedTox receives samples from clients all over the country and tests those samples for drugs and toxins, including cyanide. On January 5, 1998,

MedTox received several samples, including a gray-topped blood tube, from Aegis and tested them for cyanide. The blood contained greater than two micrograms per milliliter of cyanide. On January 15, 1998, MedTox received a second, lavender-topped blood tube from Aegis. A second test showed that the blood contained one microgram per milliliter of cyanide. Cyanide was not present in any other samples. When MedTox does not know a specimen's collection date, the employee entering that information into the computer enters an arbitrary date. Although cyanide is very unstable in blood and tissues, the victim's whole blood had been preserved in sodium fluoride. Therefore, her blood was the most important specimen, and testing her tissues may not have been helpful.

John Gerber is an Associate Medical Examiner for Davidson County, and the court found him to be an expert in forensic pathology for the state. He said that cyanide is normally present in the body and that the nonlethal cyanide level in smokers is higher than in nonsmokers. He said that cyanide is lethal at one to fifteen micrograms per milliliter. Dr. Gerber stated that Dr. Ward concluded that the victim died of cyanide poisoning, and he agreed with her conclusion. He said that Dr. Ward also diagnosed the victim with viral pneumonia but that he disagreed with the diagnosis. He stated that while the victim could have been injected with cyanide, no injection marks were found on the victim's body. He also testified that finding cyanide in the blood, but not the gastric contents, was not contradictory because inhaled cyanide would be present in the blood but not the stomach. He said that while the right side of the victim's heart had abnormally high amounts of fatty tissue and her lungs were heavier than normal, these did not cause her death. However, he stated that the victim's glucose level at the time of death was very high and that she could have been suffering from diabetes. Dr. Gerber stated that tissue samples were not tested but that it is better to test liquids than tissues.

Dr. Charles Harlan is a specialist in anatomic, clinical, and forensic pathology. The court found him to be an expert in forensic pathology for the defense. He stated that the victim was suffering from viral syndrome. He also stated that the victim had mild to moderate fatty degeneration of the liver consistent with a number of entities and syndromes. Dr. Harlan testified that although the victim's blood tested positive for cyanide, there was no evidence of an injection site and no cyanide in the gastric contents to indicate ingestion. He said that if the victim had inhaled cyanide, there would have been hemorrhaging in the lungs. Dr. Harlan said that the victim's high glucose level indicated that she was a diabetic suffering from a viral illness. He stated that this viral illness and fat in the liver and heart showed that she died of Reye's Syndrome. He testified that pictures of the victim's lung and liver tissues confirm that she died of Reye's Syndrome. He stated that the positive test result for cyanide in the blood was a lab error, i.e., either the sample was contaminated at the time it was drawn or the laboratory improperly tested it. In his written report, Dr. Harlan stated that Reye's Syndrome produces increased blood ammonia and that the victim's blood was not tested for ammonia. The report also stated that it was probable that the cyanide reported from the blood sample was really ammonia. On cross-examination, Dr. Harlan testified that Reye's Syndrome is not usually fatal in adults, and of the forty autopsies he has done on people with Reye's Syndrome, only five to eight were over the age of thirty.

Dr. Bruce Levy testified as follows: He is the Chief Medical Examiner for Metro Nashville/Davidson County and the Chief Medical Examiner for the State of Tennessee. The court

found him to be an expert in anatomic, clinical, and forensic pathology for the state. He reviewed the autopsy report with Dr. Ward and Dr. Gerber but did not see the victim's body. He disagreed with Dr. Harlan that the victim died of Reye's Syndrome, an unusual condition. Reye's Syndrome begins with a viral syndrome and often the victim has ingested aspirin. Although this victim had viral syndrome, she did not ingest aspirin. Usually, victims of Reye's Syndrome have fatty replacement of the liver, the liver is enlarged and yellow, and the level of ammonia in the body increases. The autopsy report said that the victim's liver was normal size and red-brown in color. Her liver cells did not look anything like those of a person suffering from Reye's Syndrome, and her body was not tested for ammonia. Reye's Syndrome also results in fat deposits in the kidneys and heart, swelling of the brain, and low blood sugar. The victim had no fat deposits in her kidneys. Although she had fat deposits in the right side of her heart, they were not the small bubbles of fat you would expect to see in a person suffering from Reye's Syndrome. She had no brain swelling, and her glucose level was high. Dr. Levy was not aware of any instances of contamination at the medical examiner's office, and that office does not store cyanide. He ruled out ingestion and injection of cyanide because cyanide was not in the victim's gastric contents and there was no injection site. Inhaling cyanide gas causes very rapid death. Therefore, with no forms of cyanide found around the body, the victim did not commit suicide. However, Dr. Levy pointed out that photographs of the victim's lungs showed evidence that she had inhaled a toxic substance. He concluded that the victim had a fatal level of cyanide in her body and that cyanide caused her death, a homicide. On cross-examination, Dr. Levy acknowledged that he had never autopsied a body with Reye's Syndrome and that a microscopic examination of the victim's liver showed mild to moderate fat deposits were present. He also said that the dark substance around the victim's mouth was negative for cyanide.

Dr. Timothy Meredith is the Director of the Center for Clinical Toxicology and is a professor of medicine and pathology at Vanderbilt University. He is a medical doctor and the trial court found him to be an expert in clinical toxicology for the defense. He stated that when the victim went to Baptist Centra Care, her blood pressure was elevated and she was under respiratory distress. He said that most of the right ventricle wall of her heart had been replaced by fatty tissue. He also stated that her lungs were congested and that her stomach contained a dark brown liquid. Dr. Meredith testified that the Aegis Laboratory report said that the victim's blood had been collected on December 22, 1997, the day before she died. He said that the report showed that cyanide was present in the blood in a concentration greater than two micrograms per milliliter. Dr. Meredith testified that although the Aegis report said that colorimetric and photometric techniques were used to test the victim's blood, MedTox, not Aegis, tested the blood and used more sophisticated techniques. He said that MedTox should have retested the blood for cyanide from the same gray-topped tube but that MedTox ran out of that blood sample and had to request another tube of blood for the retest. Dr. Meredith also noted that Aegis had never logged in the second tube, meaning that there was no way to tell the source of the second tube. He said that based on these and other discrepancies, he could not say that the victim's blood contained toxic levels of cyanide. He stated that if a person inhaled cyanide, then cyanide would be found in the blood, lungs, upper respiratory tract, and possibly the gastric contents and liver. On cross-examination, Dr. Meredith stated that the wrong date on the blood tubes could be a typographical error. He also acknowledged that cyanide can be fatal at one microgram per milliliter, but he said that many people have survived with concentrations of cyanide in their blood greater than the cyanide concentration in the victim's blood.

Kirk Myers testified as an expert in business evaluation as follows: He is a CPA and performs business appraisals. He analyzed the victim's and defendant's business, Southern Debt Management. The victim and defendant started their business in April 1996. The victim was responsible for bookkeeping, collecting accounts, and computer data entry. The defendant did not know how to use a computer and was responsible for acquiring new business. In 1996, Southern Debt Management made a fourteen-thousand-dollar profit, and in 1997, it made a twenty-two-thousand-dollar profit. The victim was vital to the business, and it closed because of her death. Although the defendant could have hired someone to help him, this would have taken all of the business' profit, and the defendant chose to close the business. Mr. Myers found no receipts for any type of insurance payments.

The defendant testified that he and the victim started dating in 1987 and married in September 1989. He said that he worked as a salesperson at Tennessee Valley Exterminating from April 1987 to October 1987 but did not handle chemicals. The defendant said that Brittney came to live with them in 1989 and that the victim considered Brittney to be her daughter. He said that he and the victim had financial problems but that he was never without a job for more than a week. He said he and the victim borrowed money from the Yorks for the down payment on a new car. He said they tried to repay the Yorks by sending them a check for half of the down payment, but the Yorks tore up the check. The defendant said that he and the victim were close to the Yorks and that the two couples did many activities together. He stated that in April 1996, he and the victim started working together in their small collection agency. He testified that the victim handled calls, entered information into the computer, generated letters, and managed all money that came in. He said that he did not know how to operate a computer. The defendant stated that when his mother was diagnosed with brain cancer in March 1997, he started ignoring the business. He said this led to a downslide in the business and to arguing between him and the victim. He said that he and the victim wrote letters to each other after arguments to express themselves. The defendant said that in 1997, he and the victim agreed to paint and carpet parts of the house as their Christmas presents to each other. He stated that despite this agreement, he bought the victim several gifts that Mrs. York wrapped for him.

The defendant testified that the victim cooked dinner on Sunday, December 21, 1997, for her dad and stepmother, but she was too sick to eat. He said that when the victim came to bed that night, she told him that she felt sick on her stomach. He said that around 2:00 and 2:30 a.m., she got sick in bed. He stated that he got her some Coke to drink, but she could not keep it down. He said that about 3:00 a.m., he went to Walgreens and bought her some lemon-lime Gatorade. The defendant said that the next morning, the victim told him that she needed to see a doctor. He said that he asked her if she wanted to go to Baptist Centra Care or the emergency room and that she said she did not want to go to the hospital. The defendant said that he called Mrs. York and told her that he was taking the victim to Baptist Centra Care and asked Mrs. York if she wanted to go with them. He stated that Mrs. York came over to the house, they took the victim to Baptist, the victim saw the doctor, and they got home around noon. The defendant said that he left to run errands while Mrs. York stayed with the victim. He said that he got home about 4:30 p.m. and found the victim asleep in bed. He said that he noticed she had labored breathing, which concerned him. He said that he

asked Mrs. York about the victim's breathing and that she told him it was a normal reaction to the Phenergan shot. The defendant testified that Mrs. York left around 6:00 p.m. and offered to take Brittney with her. He said he never left the house after that. He stated that at 7:00 p.m., he ordered a pizza, ate, and fell asleep on the couch. He said that Mrs. York called about 10:00 p.m. and that he checked on the victim for her. The defendant said that the victim was asleep and that she still had labored breathing. He said that he then went to sleep on Brittney's bed.

The defendant testified that he slept all night and that when he woke up the next morning, he checked on the victim. He said that her labored breathing had stopped and he thought she was breathing normally. He said that he tried to wake her and discovered that she was dead. He said that he called 9-1-1 and tried to give his wife cardiopulmonary resuscitation (CPR). He stated that he blew into her mouth a couple of times and held her nose, but he got no response. The defendant said that he called Mrs. York. He stated that after medical personnel examined his wife, they told him that she had been dead for some time. The defendant said that he asked for a full autopsy.

The defendant testified that he and the victim had discussed funeral arrangements and that they agreed to have only a graveside service. He said he refused to bury her on Christmas day. The defendant said that he and his wife did not have any life or health insurance and that the funeral bill had not been paid. He said that after her death, he could not sleep in their bed, so he sold it.

The defendant testified that Detective Bernard accused him of having an affair and killing his wife. He said that he told Mr. York that he had slept with another woman in October or November 1997 and that he had sex with another woman on January 23, 1998. He said that the November 1997 incident occurred in his car and the January 1998 incident took place on the couch in his living room. He denied that he or the victim wanted to declare bankruptcy, and he denied that he ever told Mr. York that he wanted to plea bargain. He said that his wife meant what she said in the "I will not be cheap" letter that she wrote to him on August 3, 1997. He stated that he did not have cyanide in the house and that he did not kill his wife.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction for first degree murder. He argues that his business, Southern Debt Management, depended on the victim for its survival, that he and the victim had no health or life insurance, and, thus, that he had no motive to kill his wife. In addition, he contends that she had been sick for several days before her death, that there were no injection sites on the victim's body, that no cyanide was found in any specimens Detective Bernard took from the house, and that his experts disputed the state's proof that the victim died from cyanide poisoning. The state argues that the evidence was sufficient to support the conviction.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh

the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988).

> The law is firmly established in this State that to warrant a criminal conviction upon circumstantial evidence alone, the evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he is the one who committed the crime.

Pruitt v. State, 3 Tenn. Crim. App. 256, 267, 460 S.W.2d 385, 390 (1970). While following these guidelines, we must note that the jury decides the weight to be given to circumstantial evidence and that the "'inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 203 Tenn. 440, 452, 313 S.W.2d 451, 457 (1958) (quoting 2 Wharton's Criminal Evidence 1611).

The first degree murder charged in this case is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is defined as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

Viewed in the light most favorable to the state, the evidence reveals that the defendant used cyanide to poison and kill the victim. The victim and defendant were having serious financial problems and were at odds over whether to declare bankruptcy. In addition, the victim had indicated to the defendant that she was contemplating divorce and that she would not be cheap. The victim had been sick with flu-like symptoms for several days prior to her death. When she saw a medical doctor, he concluded that she had a viral syndrome and that her life was not in danger. However, less than twenty-four hours later, the thirty-three-year-old victim was dead. Two separate blood tests revealed that lethal levels of cyanide were present in the victim's blood, and the doctor who performed the autopsy ruled that cyanide poisoning caused her death. No injection sites were found on the victim's body, and cyanide was not found in her stomach. The fact that cyanide was present in the blood, but not the stomach, indicated that the victim inhaled cyanide. Because death by inhaling cyanide occurs quickly, and no cyanide was found around the victim, she could not have committed suicide. Thus, someone administered the cyanide gas to the victim. With the defendant being alone with the victim from 6:00 p.m. on December 22, 1997, until 6:30 a.m. December 23, 1997, he had sufficient time to poison his wife. In addition, he had worked for an exterminating company where chemicals that contain cyanide were readily accessible. Although no direct evidence that the defendant killed his wife existed, the jury could have found beyond a reasonable doubt that the defendant intentionally, and with premeditation, used cyanide to poison her. We conclude that the evidence is sufficient to support the defendant's conviction for first degree murder.

## II. RESTRICTION OF EXPERT TESTIMONY

The defendant contends that the trial court committed plain error by limiting Dr. Meredith's testimony. Specifically, he contends that the court should have allowed Dr. Meredith to testify as to the victim's cause of death. In addition, he argues that the defense was restricted from asking Dr. Meredith about what areas of inquiry he would suggest to a pathologist to determine the cause of death and that Dr. Meredith was not allowed to testify about proper laboratory procedures in the collection and determination of the presence of cyanide. The state argues that the court properly limited Dr. Meredith's testimony and that any error in the limitation was harmless.

In a pretrial hearing, Dr. Meredith testified that he had several medical degrees from Cambridge University in the United Kingdom. His curriculum vitae reflects that he practiced general medicine and surgery beginning in 1975 and that he ultimately focused upon clinical toxicology. He served as a clinical toxicology consultant to the World Health Organization. At the time of his testimony, Dr. Meredith was the director of the Center for Clinical Toxicology at Vanderbilt University Medical Center and was a professor of medicine and pathology at Vanderbilt Medical School. He said that he sees patients on a daily basis that are suffering from the toxic effects of chemicals. When asked if he has ever determined a patient's cause of death, he said that about thirty times a year, colleagues give him a set of facts and, based on those facts, he gives them advice as to a patient's cause of death. Dr. Meredith testified that based on the victim's medical records from Baptist Centra Care, the autopsy report, and the reports from Aegis and MedTox laboratories, he could not say that the victim died from cyanide poisoning. When asked if he had determined the victim's cause of death, he said that he had not. Based upon Dr. Meredith's qualifications and proposed testimony, the trial court ruled that he was an expert in clinical toxicology.

At trial, Dr. Meredith testified that he could not agree that the victim died of cyanide poisoning. Defense counsel then asked him if he had determined the victim's cause of death. The state objected, and the trial court refused to allow Dr. Meredith to answer the question. The court reminded the defense that Dr. Meredith could testify about the victim's cause of death only if the defense qualified him as an expert in forensic pathology. The defense stated that it would not do that.

The defendant contends that Dr. Meredith should have been allowed to testify about the victim's cause of death. He asserts that Dr. Meredith is a world-renowned toxicologist, a prolific author, and the head of the Center for Clinical Toxicology at Vanderbilt Medical Center. He argues that Dr. Meredith was qualified to give an opinion on cause of death. The state argues that the trial court properly limited his testimony and any error was harmless.

Initially, we note that the defendant's brief does not explain why the limitation of Dr. Meredith's testimony was plain error. In our review of the record, we find nothing to indicate that the restriction of his testimony requires plain error analysis. See Tenn. R. Crim. P. 52(b); State v. Adkisson, 899 S.W.2d 626, 636-42 (Tenn. Crim. App. 1994).

The admissibility of expert testimony is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. State v. Tizard, 897 S.W.2d 732, 748 (Tenn. Crim. App. 1994). Rule 702, Tenn. R. Evid., states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703, Tenn. R. Evid., states, "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Determinations concerning the admissibility of expert testimony, including the basis of the expert opinion, are within the discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993); see also State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). However, the jury determines the weight and credibility of the expert's testimony. State v. Anderson, 880 S.W.2d 720, 732 (Tenn. Crim. App. 1994).

We are perplexed by the trial court's determination that Dr. Meredith was not qualified to give an opinion regarding cause of death. In addition to showing that he is a specialist in clinical toxicology, the record reflects that Dr. Meredith is licensed to practice medicine in Tennessee, has over twenty-five years of experience, and sees patients on a daily basis. He testified that he routinely assists his colleagues with determining causes of death. He holds the position of Professor of Medicine and Pathology at Vanderbilt University Medical School. An expert does not have to be a forensic pathologist in order to give an opinion as to cause of death. See State v. Duncan, 698 S.W.2d 63, 68-69 (Tenn. 1985) (holding that a general surgeon is qualified to give his opinion about the victim's cause of death but not regarding how the crime occurred); State v. Bragan, 920 S.W.2d 227, 245 (Tenn. Crim. App. 1995) (concluding that the Hamilton County medical examiner, who had no specialized training or education in forensic pathology, was qualified to give a cause of death opinion); Owens v. State, 202 Tenn. 679, 308 S.W.2d 423, 424 (1957) (holding that an embalmer with twenty years of experience could testify as to cause of death); Franklin v. State, 180 Tenn. 41,

171 S.W.2d 281 (1943) (determining that an undertaker was qualified to testify that knife wounds caused the victim's death). In this respect, we have found no Tennessee case that bars a licensed medical doctor from giving an opinion regarding cause of death. We conclude that Dr. Meredith was qualified to testify as to the victim's cause of death. However, we do not believe that the trial court's restriction constitutes reversible error.

During the pretrial hearing, the defendant asked Dr. Meredith if he had determined the victim's cause of death, and Dr. Meredith replied that he had not. At trial, the defendant again asked him if he had a conclusion as to the victim's cause of death. Once the trial court granted the state's objection and refused to allow Dr. Meredith to answer the question, the defendant was obligated to make an offer of proof given the circumstances of the case. Rule 103(a)(2), Tenn. R. Evid., provides that in order to reverse a trial court's ruling to exclude evidence, a substantial right of a party must be affected and, if not apparent from the context, "the substance of the evidence and the specific evidentiary basis supporting admission" must be made in an offer of proof. We see nothing in the record to indicate that Dr. Meredith acquired new information between the time of the pretrial hearing and his taking the stand at trial. We also note that the record reflects that he did not sit in the courtroom and listen to other witnesses testify before giving his testimony. Given Dr. Meredith's pretrial testimony that he had not determined a cause of death and the defendant's failure to make an offer of proof as to whether Dr. Meredith had subsequently formed an opinion, we will not speculate about whether Dr. Meredith had formed an opinion as to the victim's cause of death. Moreover, we note that Dr. Meredith was allowed to give his opinion that cyanide poisoning was not the cause of death. Therefore, the record fails to show that the defendant was prejudiced by the trial court's ruling.

We also believe that the defendant did not take steps that were available to him to counteract the trial court's error. A party "who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error" is not entitled to relief. T.R.A.P. 36(a). In this respect, the record reflects that the trial court gave the defendant the opportunity to try to qualify the witness as a pathologist, but the defendant chose not to take it. Because the defendant took no action to prevent the harmful effect, if any, of the trial court's error, he is not entitled to relief on this issue.

The defendant also contends that the court improperly restricted Dr. Meredith from testifying about suggestions he would give to a pathologist regarding the cause of death. Given our view of Dr. Meredith's expertise, we believe the trial court again erred by restricting his testimony. However, the defendant did not make an offer of proof as to Dr. Meredith's testimony, and we cannot speculate as to his proposed testimony or its purpose. Again, the defendant has failed to demonstrate how he was harmed by the trial court's restriction.

Finally, the defendant argues that the trial court did not allow Dr. Meredith to testify about proper laboratory procedures in the collection and determination of the presence of cyanide. The defendant's brief fails to cite to anything in the record to support his contention, and we find nothing in the record to support his argument. Dr. Meredith testified about what happens to cyanide in the blood after blood is drawn and stored, where inhaled cyanide would be found in the body, and why the second test for cyanide should have come from the same blood tube. He also testified as to the

various discrepancies in the Aegis and MedTox laboratory worksheets and the fact that the dates on the blood tubes indicated that the victim's blood was drawn prior to her death. The state did not object to this testimony and nothing in the record indicates that the court limited Dr. Meredith's testimony in this area. We see no improper limitation to testimony about laboratory procedures.

### III. RULE 404(b)

The defendant contends that the trial court erred by allowing Ken York to testify about two sexual encounters the defendant had outside the marriage. He states that each incident involved a different woman, the first occurring fifty-two days before the victim's death, and the second occurring thirty days after her death. He argues that with two different women involved, Rule 404(b), Tenn. R. Evid., prohibited admission of the testimony because there was no showing of a plan, scheme, or motive. He also argues that the court should have excluded the evidence because its probative value was outweighed by unfair prejudice. The state argues that the evidence was admissible and that any error by the court was harmless.

Rule 404(b), Tenn. R. Evid, prohibits the introduction of evidence of other crimes or acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent, or motive, and its probative value is not outweighed by the danger of unfair prejudice. The rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The Advisory Commission Comment to the rule notes that under this procedure, the trial court must further find that the evidence of the other act is "clear and convincing" as required by State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).

## A. Defendant's Sexual Conduct Before Victim's Death

In a jury-out hearing, Mr. York testified that the defendant said he had extramarital sex before the victim's death. The defendant argued that the evidence was irrelevant and that its probative value was outweighed by the danger of unfair prejudice. The state argued that the evidence was relevant to intent. The trial court ruled that the conduct was relevant to the relationship of the parties and admissible. We agree with the trial court.

We conclude that the evidence of defendant's extramarital sexual conduct before the victim's death was relevant to the relationship of the parties and probative of motive. In its case-in-chief, the state introduced several witnesses who testified about the Robinsons' deteriorating marriage. Mrs. York testified that her daughter was unhappy, that the victim and defendant had serious personal and financial problems, and that they were at odds about whether to declare bankruptcy. Mr. York testified that the victim and defendant had a stormy marriage and that the defendant told him that it was impossible to get along with the victim. Mr. York also stated that the defendant told him that he had a great need for sex but that he and the victim had not had sex since early December. Furthermore, Detective Bernard read letters into evidence that revealed that the victim and defendant had no sexual relationship and that the victim was considering divorce. The purpose of such evidence was to establish that the defendant had a motive for killing the victim. Mr. York's testimony about the defendant's extramarital, sexual conduct before the victim's death is relevant to the couple's relationship and, hence, infers motive. In addition, the evidence was clear and convincing that the defendant committed the prior bad acts. We conclude that the evidence's probative value was not outweighed by danger of unfair prejudice and that Mr. York's testimony about the defendant's extramarital conduct before the victim's death was admissible.

## B. Defendant's Sexual Conduct After Victim's Death

In the jury-out hearing, Mr. York also testified that the defendant told him that he had sexual intercourse with a woman in the marital bed, one month after the victim's death. The defendant argued that the evidence was irrelevant and that its probative value was outweighed by the danger of unfair prejudice. The state argued that the evidence was admissible to show the defendant's intent. Although the trial court ruled that Mr. York's testimony was admissible, the court did not specifically state on the record what issue the testimony addressed. We note, however, that the court gave a limiting instruction that prohibited the jury from considering the testimony for anything other than motive, intent, or completion of the story. Before the jury, when the prosecution asked Mr. York where the defendant's sexual encounter on January 23, 1998, took place, Mr. York replied, "It occurred in their house in her bed."

While we agree with the trial court that evidence that the defendant had a sexual encounter in the marital bed after the victim's death may be relevant to infer the defendant's motive, we conclude that the probative value of the location of the encounter was outweighed by the danger of unfair prejudice. The general rule excluding evidence of other bad acts exists because such evidence can have a significant impact on the jury and cause the jury to convict the defendant because the

defendant is a bad person. See State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994). Our supreme court has stated that unfair prejudice is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Note). In the present case, the fact that the defendant had sex with another woman, one month after his wife's death, may be slightly probative to infer the defendant's motive. However, we believe that allowing the witness to testify that the act occurred in the victim's bed risks stirring emotions that could cause the jury to decide the case on an improper basis. Furthermore, the state did not need this evidence because 1) Mrs. York testified that the defendant and victim had personal and financial problems and were at odds over whether to declare bankruptcy; 2) Mr. York testified that in the fall of 1997 the victim's and defendant's marriage rapidly deteriorated; 3) Mr. York testified that the defendant had a great need for sex and that the defendant had engaged in extramarital, sexual conduct prior to the victim's death; and 4) Detective Bernard read into evidence letters in which the victim threatened to divorce the defendant and warned him that he would pay for it. All of that evidence was ample to infer that the defendant had a motive to kill the victim and evidence of the post-death sexual conduct was cumulative. We believe that any probative value of the marital bed incident was slight in comparison to the danger of unfair prejudice. We conclude that the trial court should not have admitted the evidence.

Although the trial court should not have allowed evidence about the defendant having a sexual encounter in the marital bed after the victim's death, we believe that the defendant has failed to show prejudice. Pursuant to Rule 36(b) T.R.A.P., a reversal for trial error may not occur "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." In this respect, we note that Mr. York mentioned the incident once, testifying "it occurred in their house in her bed." The state made no other mention of the incident, in closing argument or otherwise. The defendant testified about it but denied that anything occurred in the bedroom. The jury was already aware of the defendant's other extramarital encounter. Also, after Mr. York's testimony, the trial court instructed the jury that it could consider evidence of the defendant's sexual conduct before and after the victim's death only for proof of motive, completion of the story, intent, or knowledge. Although we see no need for the evidence to complete the relevant story of the case, the remaining limitations in the instruction were proper. Given these circumstances and the strength of the state's circumstantial case, we cannot conclude that evidence of a sexual encounter in the marital bed after the victim died more probably than not affected the verdict.

In sum, we conclude that the trial court did not abuse its discretion when it admitted evidence that the defendant had an extramarital encounter before the victim's death. Upon review of the admissibility of the evidence concerning the defendant's sexual encounter after the victim's death, we conclude that the probative value of the evidence was outweighed by the danger of unfair prejudice and that the trial court should not have admitted that evidence. Nonetheless, such error was harmless.

# IV. JURY COMPOSITION

The defendant argues that he was denied the right to be tried by a fair and impartial jury of his peers because the gender ratio of this jury, ten women to two men, was disproportionate to the actual gender ratio of the venue of the offense. However, the defendant's brief makes no argument and fails to cite to any authority to support his claim. In addition, the brief makes no reference to the record and the defendant did not provide this court with a transcript of the jury selection process. It is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal. Tenn. R. App. P. 24(b); State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987); State v. Rhoden, 739 S.W.2d 6 (Tenn. Crim. App. 1987). Generally, this court is precluded from addressing an issue on appeal when the record fails to include relevant documents. See Tenn. R. App. P. 24; State v. Bennett, 798 S.W.2d 783 (Tenn. Crim. App. 1990). By failing to include the transcript of the jury selection process in the record, the defendant has waived this issue.

# V. OUTSIDE INFLUENCE ON JURY

The defendant contends that he was denied a fair trial because a movie about a man who murdered his wife with cyanide aired on a local television station during the trial. However, once again, the defendant's brief fails to make an argument, cite to any authority, or make any reference to the record. Nevertheless, we find that there is no merit to this claim.

The morning after the movie aired, the judge questioned the jurors as to whether they had seen the movie the previous night, and the following exchange occurred:

> The Court [to the jury]: Good morning. The jury is now present in the courtroom. We are about ready to begin the proof and we will be finishing this case today, but before we get started, I need to inquire about something.
>
> As you recall, when we did voir dire and all the way through this process, I've been advising you not to form an opinion as to the verdict and not let anything interfere with your decision-making process, other than what you hear in the courtroom.
>
> Now it has come to my attention that there was a made for television movie on last night. Did anybody watch a moving starring John Ritter last night?
>
> Juror Ms. Hunter: I started watching it and I turned it off.
>
> The Court: Ok, that is, Ms. Hunter, you started watching. Did you complete the movie?

Juror Ms. Hunter: No, I did not.

The Court: Okay, all right. Whatever you watched, Ms. Hunter, can you set that aside and not allow that to have any effect on your opinion in this case?

Juror Ms. Hunter: Yes, ma'am.

The Court: Ok, all right, and I take it from everybody else looking confused that you probably watched the ball game or something like that. No one else watched that movie? All right.

Again, my same admonitions to you. You must decide this case strictly on what you hear from he [sic] witnesses in this courtroom and nothing else. Can everybody promise me that you will do that?

All right, now Mr. Gross, are you ready with your next witness?

The trial court properly questioned the jurors about the movie as soon as the issue was raised at trial. Although one juror said she watched part of the movie, the trial court asked her if she could put aside what she saw and not let it have any effect on her opinion in the case. The juror said that she could. There is no indication that any other juror had seen the movie, and the trial court instructed the jurors about their obligations. Ordinarily, we presume that jurors follow such instructions. State v. Alvarado, 961 S.W.2d 136 (Tenn. Crim. App. 1996). We find no evidence that the jury was tainted by extraneous, prejudicial information, and we conclude that there is no merit to this issue.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE

-18-