IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 18, 2001

## STATE OF TENNESSEE v. MARK ALLEN HASKETT

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 231876     Douglas A. Meyer, Judge**

_____

**No. E2001-00600-CCA-R3-CD**
**October 31, 2002**
_____

The Defendant pled guilty to aggravated burglary and assault. The Defendant received a sentence of six years for the aggravated burglary conviction and a sentence of eleven months and twenty-nine days for the assault conviction. The trial court ordered that the six-year sentence for aggravated burglary be served concurrently with the sentence for assault, but consecutively to a sentence for evading arrest from another case. The Defendant's effective sentence in this case is six years in the Tennessee Department of Correction. On appeal, the Defendant challenges the length of his sentence for aggravated burglary and the manner of service of his sentences. Although the trial court misapplied certain enhancement factors, we conclude that the sentences imposed are appropriate and affirm the judgments of the trial court.

**Tenn. R. Crim. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, joined.

Alan R. Beard, Chattanooga, Tennessee, for the appellant, Mark Allen Haskett.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William H. Cox, III, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Procedural History

On February 23, 2000, the Hamilton County Grand Jury indicted the Defendant for aggravated burglary and aggravated assault. Both charges stemmed from an incident on November 6, 1999, when the Defendant entered the habitation of his former wife, Pam Perry, without her consent and with the intent to assault her. The Defendant then assaulted Ms. Perry, although he had allegedly been enjoined from doing so by an order of protection.

After the Defendant failed to appear in court on March 3, 2000, a capias was issued for the Defendant's arrest. On July 21, 2000, a law enforcement officer approached the Defendant and attempted to arrest him pursuant to the capias. The Defendant scuffled with the officer, broke free, and leaped from a second story window to the ground, breaking both ankles in the process. This incident resulted in an indictment against the Defendant for evading arrest.

On December 8, 2000, the Defendant filed in the trial court a "PETITION TO ENTER PLEA OF GUILTY AND WAIVER OF TRIAL BY JURY," in which he entered guilty pleas to charges of evading arrest, aggravated burglary, and "[s]imple [a]ssault." The petition indicates that the manner of service of the sentences was to be determined by the trial court: In the petition, under the printed heading "Agreement as to Sentence," the words "Open Plea - Judge will Decide" are handwritten opposite the offense of evading arrest, with dittos inserted for the offenses of aggravated burglary and "[s]imple [a]ssault."

We note that although the Defendant and the State have addressed in this appeal issues pertaining to the Defendant's sentence for evading arrest in indictment 234557, the record indicates that the evading arrest case is not properly before our Court. It is clear from the record that the Defendant pled guilty to evading arrest in indictment 234557 at the same time that he pled guilty to aggravated burglary and assault in indictment 231876. The Defendant was sentenced in both indictments following a single sentencing hearing. However, indictment 234557 is not included in the notice of appeal filed by the Defendant and neither indictment 234557 nor the judgment convicting the Defendant of evading arrest in indictment 234557 is a part of the record before us. We will therefore address in this appeal the issues raised concerning the convictions for aggravated burglary and assault, which are the subjects of indictment 231876.

## II. Sentencing Hearing Evidence

On February 16, 2001, the trial court conducted a sentencing hearing, at which the following evidence was presented: Pamela Dawn Perry, the Defendant's former wife, testified that she was married to the Defendant for a period of three years and that they had a daughter, who was five years old at the time of the sentencing hearing. Perry testified that in November 1999, the Defendant cut her phone lines, broke into her apartment, and assaulted her in her front yard. She stated that prior to cutting her phone lines, the Defendant had called her repeatedly, approximately eight to ten times, and she reported that she had tape-recorded one of the phone calls. According to Perry, the Defendant told her "if [she] wasn't going to be with him, then [she would] be his enemy." Perry reported that the Defendant was arrested after the incident but was later released on bond.

Perry testified that while out on bond, the Defendant came to her home in June or July 2000 to pick up their daughter. She recalled that when the Defendant arrived, she invited him into her home because their daughter was eating. Perry stated that the Defendant told her he "wanted to talk," and she responded, "No more talking. . . . It's completely over. I don't want anything to do with you." According to Perry, the Defendant then leaned down to their daughter, who was four years old at the time, and said, "Daddy's going to kill himself and it's Mommy's fault." Perry, not

taking the Defendant's threats seriously, watched the Defendant exit through her back door. Shortly thereafter, she noticed that he had hung himself from a light cord on the deck. Perry testified that she called 9-1-1, went outside, cut the Defendant down, and began to perform CPR on the Defendant. She stated that the Defendant was "dead" when she cut him down, but she was able to resuscitate him.

Perry testified that two mornings later, the Defendant again appeared at her door. She stated that he was angry because she had "cut him down." She testified that while her daughter was in the room, the Defendant told her that "[h]e had fulfilled what he wanted to do and [she] had stopped him, and that next time he did this he would take more people with him." Perry stated that she then called the police.

Perry reported that her daughter had been traumatized by the Defendant's suicide attempt and was undergoing therapy. Perry also testified that she was having nightmares as a result of the Defendant's behavior, that she would not go to the back of her house after the suicide attempt, and that she was frightened of the Defendant. She reported that the Defendant had a history of abusive behavior towards her, and she stated that she had previously sought protection orders against him. Perry expressed her hope that the Defendant receive the maximum sentence possible so that she could feel safe.

On cross-examination, Perry was asked whether she reconciled with the Defendant after the crimes to which the Defendant had pled guilty. She responded, "I wouldn't actually call it reconcile. I kept [the Defendant] close to me because nobody in the police department could seem to find him after he disappeared, and with one phone call I managed to find him when no one else could." Perry admitted, however, that several months later, she reconciled with the Defendant "[o]ff and on," and at one point, she went to court with the Defendant to help him with the charges in this case.

Perry specified on cross-examination that the Defendant assaulted her by getting on top of her on the ground and placing his hands around her neck. She reported that she sustained bruises as a result of the attack and that on the following day, after she "got [her] kids safe," she went to the hospital. Perry also testified that on a previous occasion, the Defendant either threw her onto the floor or dropped her, causing her to sprain her ankle. She reported that on other occasions, the Defendant had bruised her.

Perry stated on cross-examination that she had obtained "[q]uite a few" orders of protection against the Defendant. She admitted that in one of the orders of protection, she alleged that the Defendant had abused or molested her son. She further testified that in an order of protection that was being filed at the time of the hearing, she alleged that the Defendant had molested their daughter.

Chris Chambers, a member of the Domestic Violence Task Force of the Hamilton County Sheriff's Department, testified that he was involved in the investigation of this case and that he "actively search[ed]" for the Defendant after a capias was issued for the Defendant's arrest following

incidents involving Pam Perry. Chambers recalled that during this time, he spoke with Perry on the phone on several occasions and arranged to have her phone calls "tracked." According to Chambers, Perry called him in July 2000 and told him that she could provide phone numbers that Chambers could use to reach the Defendant. Chambers used the phone numbers to try to locate the Defendant, but according to Chambers, the Defendant was "elusive." Chambers testified, however, that one of the phone numbers, which belonged to a woman, eventually led him to the Defendant.

Chambers testified that when he went to the woman's apartment, he knocked on the door, but received no answer. However, as he began to leave, the door opened, and Chambers saw the Defendant standing in the doorway. Chambers testified that he pulled his gun and told the Defendant to turn around and place his hands behind his back. Chambers reported that as he began to place handcuffs on the Defendant, the Defendant ran into the hallway. Chambers testified that he "tackled" the Defendant, but the Defendant was able to break free and run to a second-story window at the end of the hall. Chambers reported that the Defendant next jumped from the window, rolled over, stood up, and then continued to run. He stated that he pursued and eventually caught the Defendant. Chambers testified that the Defendant broke his ankles when he jumped out of the window.

Chambers testified that he also investigated the assault and aggravated burglary committed against Perry. He stated that he examined Perry's phone lines. He reported that he also noted a large hole in the wall of Perry's apartment from which he could view the apartment next door, which was vacant at the time. Chambers stated that he "investigate[d] that as possibly [the Defendant] being there."

William Cason, a family violence investigator for the Walker County, Georgia Sheriff's Department, testified that he first became familiar with the Defendant three and a half years prior to the hearing. He stated that at that time, he received a phone call from an attorney representing the Defendant's former spouse, Pam Perry, whose name was then Pam Haskett. At the attorney's request, Cason went to the Haskett residence after receiving information that Pam Haskett was "being kept from leaving the residence of her own free will." Cason stated that when he arrived at the home, there were "indications that [the Defendant] was, in fact, holding her there, though not physically, more psychologically against her will." Cason stated that he transported Pam Haskett from the home, and they then went to pick up her children. Cason testified that while they were in the process of picking up one of the children, the Defendant drove to the location at a very high rate of speed, jumped out of his car, and began making "real random, vague . . . threats," such as "he was going to get even if she tried to take her child." Cason stated that he drew his weapon and told the Defendant "if he took another step he was going to make a mistake he would regret."

Cason stated that he had also attempted to serve temporary protective orders on the Defendant. He stated that on the last occasion when he tried to serve a protective order on the Defendant, he went to the home of the Defendant's father. Cason reported that when he reached the house, there were no tire tracks leading to or from the house, although it had been snowing. He

stated, "I have every reason to believe [the Defendant] was there but his father told me that he was not there."

Finally, Cason testified that he was investigating the Defendant concerning the alleged molestation of Pam Perry's oldest child. He reported that he also planned to begin investigating the alleged molestation of Perry's daughter.

Sandra Caldwell, an employee of the Board of Probation and Paroles for the State of Tennessee, testified that she prepared the presentence report in this case. She stated that on January 31, 2001, she interviewed the Defendant. According to Caldwell, the Defendant accepted no responsibility for his actions and instead told her that "this was the result of his ex-wife being vindictive."

Shelba Haskett, the Defendant's mother, testified that she recalled the incidents leading to the Defendant's arrest in this case. She stated that after the incidents, Perry visited her home a couple of times and also called her home. Ms. Haskett further testified that during April and May of 1999, Perry brought her car to the Haskett home, and the Defendant put brakes on the car. According to Ms. Haskett, Perry did not appear to be afraid of the Defendant at any time during this period. In addition, she testified that when the Defendant did not call Perry, Perry called the Defendant. Haskett stated, "I just thought they had gotten back together again and that's the way it appeared to me. Seemed like things were working out."

The Defendant testified that he was thirty-four years old at the time of the hearing. He stated that he had been working in pest control for two years prior to breaking his ankles. He explained that at the time of the hearing, he had two broken ankles, one "crushed" foot, and six injured vertebras in his spine. He also reported that he had undergone one surgery and expected to undergo three more surgeries. He stated that he had been in a wheelchair and that he had been incarcerated for over seven months.

The Defendant testified that he was married to Pam Perry from 1995 until 1998. He reported that they had one child together. The Defendant testified that although he was a Georgia resident, he planned to move to Nashville with his new girlfriend and work in "sales" upon his release. He stated that he wished to "get[] away" from Perry because she is a "dangerous woman." He explained, "[S]he initiates the phone calls for us to get back together and we do reconcile, and when she calls it quits, she don't know how to say, Well, it's over with. She wants to call the law and get the law involved to put a stop to the relationship, and that's happened every single time that we have reconciled." The Defendant claimed that he had "beat protective orders" on appeal for these reasons. He also maintained that Perry asked a judge to drop the first two protective orders that the judge had granted. The Defendant stated, "[S]he's used the law and used the law . . . and abused the law to her . . . convenience."

The Defendant explained that he pled guilty to the charges in this case because he had entered Perry's home without her permission. He maintained that he and Perry were dating at the time and

that he went into her home to see who was inside the residence. However, he also testified that Perry had told him to "watch" her apartment because she was afraid that her first former husband had hired a private investigator to watch her. With regard to the crimes in this case, the Defendant reported that as he was watching Perry's apartment, a car pulled up, and people entered the apartment. The Defendant testified that he wanted to know what was happening, so he approached Perry as she exited her apartment. He maintained that she stopped, and they "collided head-on." He denied putting his hands around her neck. The Defendant stated that he then left, telling Perry, "I'm done with it, that's it, I'm through with it." He claimed that his next contact was with Chris Chambers when he "turned [him]self in." The Defendant reported that three months later, Perry contacted him, and they subsequently reconciled.

The Defendant insisted that he had never harmed Perry and that he had never threatened her. However, he admitted that on one occasion when he and Perry were drinking, he picked her up while they were walking into their bedroom and dropped her. He stated that at the time, they had been arguing for five to ten minutes. He stated that when he dropped Perry, she "bruised her sprained ankle."

With regard to his suicide attempt, the Defendant testified that he was depressed and had been taking Prozac for his depression. He stated, "I have found out that the drug Prozac causes that." He admitted that he hung himself while his daughter was inside her home. He recalled that prior to attempting suicide, he kissed his daughter and told her that he loved her; he could not recall whether he told her what he planned to do. The Defendant denied threatening to take others with him on his next suicide attempt.

With regard to his criminal record, the Defendant admitted that a warrant was outstanding against him in Florida for resisting a "stop and frisk," and he explained that he did not show up in court for the charge because he had "never been back down to . . . Florida." He also admitted that in 1992, he was charged with several crimes, including aggravated assault, interference with government property, and a drug-related charge, but he maintained that all of the crimes occurred "at the same time." He stated that for his convictions from 1992, he served several months in jail and received five years probation. He denied ever violating probation. The Defendant also admitted that he was convicted three times in 1991 for writing bad checks; he stated that he served no time for the convictions and had paid all restitution resulting from the crimes. The Defendant maintained that he "hadn't been in any trouble since '93."

The Defendant denied molesting his daughter. He testified that Perry had accused him of molestation approximately two years before the hearing, but that she had later "dropped all allegations." The Defendant reported that he was investigated by the Department of Family and Children's Services for molesting Perry's son from a previous marriage. He stated that he was never ordered to stay away from the son, but he claimed that Perry "was ordered to keep [her son] away from [the Defendant] through her first ex-husband."

On cross-examination, the Defendant admitted that when he picked up new charges in Florida, he was attempting to avoid an outstanding capias for his arrest in Tennessee. He also testified that while in Florida, he used an alias. With regard to the charge in Florida, he stated, "I did not fight with a police officer . . . . I jerked my arm away and that was where the resisting arrest came in." He reported that the officer was trying to arrest him for "[p]ublic drunk." He further admitted that in 1992, he attempted to smuggle drugs into a jail facility to his former wife, which ultimately resulted in a conviction. The Defendant also testified that while on bond for the drug-related charges, he was involved in a "high speed chase" with police. The Defendant stated that he was accused of "ramm[ing] a patrol car" with his vehicle and as a result, pled guilty to aggravated assault on a police officer. Nevertheless, he denied trying to kill or assault the police officer. Finally, the Defendant admitted that he committed the crimes in this case while on bond for the charge in Florida.

On redirect examination, the Defendant testified that although he stayed in Florida for two to three weeks, he willingly returned to Tennessee to face the charges in this case. He denied having any intention of permanently staying in Florida to avoid arrest.

### III. Analysis

The Defendant argues that he was improperly sentenced. Initially, we note that the record before this Court does not include the transcript of the guilty plea hearing. Any evidence presented at the guilty plea hearing should be considered in determining the appropriate sentence. See Tenn. Code Ann. § 40-35-210(b)(1). Further, it is the duty of the defendant to prepare a fair, accurate, and complete record on appeal to enable meaningful appellate review. Tenn. R. App. P. 24(b). This Court has held that because it is during the guilty plea hearing that the State is allowed the opportunity to present the facts underlying the offense, "a transcript of the guilty plea hearing is often (if not always) needed in order to conduct a proper review of the sentence imposed." State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999). Failure to insure that the record before this Court conveys a fair, accurate, and complete account of what transpired in the court below concerning sentencing issues results in a waiver of such issues and a presumption that the trial court's sentencing determinations are correct. State v. Robinson, 73 S.W.3d 136, 154 (Tenn. Crim. App. 2001). In any event, the record before us supports the trial court's sentencing determinations.

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety

of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The determination of whether an enhancement factor is applicable must be undertaken on a case-by-case basis. State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2000). By statute, enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114. These limitations are intended to exclude enhancement factors that are not relevant to the offense or that are based on facts used in proving the offense. State v. Poole, 945 S.W.2d 93, 95 (Tenn. 1997); State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

The record in this case indicates that although the trial court stated on the record the enhancement factors used in sentencing the Defendant, the trial court failed to make specific findings of fact supporting the Defendant's sentence. Additionally, the trial court misapplied three enhancement factors when sentencing the Defendant for assault and two enhancement factors when

sentencing the Defendant for aggravated burglary. Our review is thus de novo with no presumption of correctness.

## A. LENGTH OF SENTENCE

The Defendant was sentenced pursuant to a plea agreement. At the sentencing hearing, the State informed the trial court that the Defendant had agreed to a six-year sentence for the aggravated burglary conviction. The State further informed the court that the Defendant had agreed to serve a concurrent sentence of eleven months and twenty-nine days for the assault conviction. Finally, the State informed the court that the Defendant had agreed to a sentence of eleven months and twenty-nine days for the evading arrest conviction. According to the State, the trial court was to decide the manner of service of all sentences and whether the sentence for evading arrest was to be served concurrently or consecutively to the other sentences.

At the conclusion of the sentencing hearing, the trial court ordered that the Defendant serve concurrent sentences of six years for the aggravated burglary conviction and eleven months and twenty-nine days for the assault conviction. The court also ordered that the Defendant serve eleven months and twenty-nine days for the evading arrest conviction, and it ordered that the sentence for evading arrest be served consecutively to the other two sentences, resulting in an effective sentence of six years, eleven months and twenty-nine days. Finally, the trial court ordered that the Defendant serve all sentences in confinement.

The Defendant now contends that he never agreed to a six-year sentence for the aggravated burglary conviction. He points out that the plea agreement does not specify that the parties agreed to a sentence of six years. He instead insists that his was an "open ended" plea, requiring the trial court to determine the length, range and manner of service of his sentences.

However, although the prosecutor clearly stated on the record at the sentencing hearing that the Defendant had agreed to a six-year sentence for the aggravated burglary conviction, neither the Defendant nor his counsel contested this statement in any way. Furthermore, the defense made no arguments or statements at the hearing indicating that the Defendant did not agree to such a sentence. Having failed to make a contemporaneous objection to statements by the prosecutor at the sentencing hearing, the Defendant cannot now be heard to complain. See Tenn. R. App. P. 36(a); State v. Sims, 45 S.W.3d 1, 16 (Tenn. 2001). We conclude that the Defendant has thus waived this issue on appeal. See id.

## B. ENHANCEMENT FACTORS

The Defendant contends, and the State concedes, that the trial court misapplied certain enhancement factors in sentencing him. Because we have concluded that the Defendant has waived any argument regarding the length of his sentence, we will consider this issue only as it pertains to the manner of service of the Defendant's sentence. See Tenn. Code Ann. § 40-35-210(b)(5) (stating that in determining the specific sentence and "the appropriate combination of sentencing alternatives

that shall be imposed on the defendant," the court shall consider evidence offered by the parties concerning enhancement factors); see also State v. Grissom, 956 S.W.2d 514, 519 (Tenn. Crim. App. 1997). After reviewing the record, we conclude that only enhancement factors (1) and (3) are applicable to the aggravated burglary conviction and that only enhancement factor (1) is applicable to the assault conviction.

The record reveals that the trial court applied the following enhancement factors in sentencing the Defendant:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

. . . .

(3) The offense involved more than one (1) victim;

(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability . . . ;

. . . .

(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

. . . .

(11) The felony resulted in death or bodily injury or involved the threat of death of bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury . . . .

Tenn. Code Ann. § 40-35-114 (1), (3), (4), (8), (11). The Defendant argues that the trial court improperly applied each of these enhancement factors. The State agrees that the trial court erroneously applied enhancement factors (3), (4) and (11).

After a review of the record in this case, we conclude that the application of enhancement factor (1) is supported by the record. The Defendant's presentence report reflects that the Defendant has a lengthy history of criminal conduct. The report reveals that between 1986 and 2000, the Defendant was convicted of several crimes, including driving under the influence of an intoxicant, writing worthless checks, assault, undefined drug-related crimes, interference with government property, and evading arrest. This history clearly supports application of enhancement factor (1).

The record does not support the application of enhancement factors (3), (4), (8) and (11) to the Defendant's conviction for assault, and the record does not support the application of enhancement factors (4), (8) and (11) to the Defendant's conviction for aggravated burglary. Enhancement factor (3) requires that the offense involve more than one victim. See id. § 40-35-114(3). Enhancement factor (4) states that "[a] victim of the offense was particularly vulnerable because of age . . . ." Id. § 40-35-114(4). The trial court based its application of these factors on the presence of the Defendant's four-year-old daughter when the Defendant committed the aggravated burglary of his former wife's residence and when the Defendant assaulted his former wife. The indictment in this case specifically charged the Defendant with aggravated assault against his former wife, Pam Perry. The Tennessee Supreme Court has stated that there cannot be multiple victims for an offense committed against a specific, named victim. See Imfeld, 70 S.W.3d at 705-706. Because

the four-year-old daughter was not a victim of the assault, she was not a "particularly vulnerable" victim. Thus, factors (3) and (4) were erroneously applied to the assault conviction.

However, we have concluded that the trial court did not err by applying enhancement factor (3) to the Defendant's conviction for aggravated burglary. The Defendant's four-year-old daughter was a resident of the apartment and present at the time that the Defendant committed the aggravated burglary of the apartment. The apartment was the habitat of both Pam Perry, (the Defendant's former wife) and the Defendant's four-year-old daughter. Thus, the aggravated burglary offense involved more than one victim so enhancement factor (3) was applicable to that offense. We believe that this case is more akin to the multiple victims scenario in State v Lewis, 44 S.W.3d 501, 507-08 (Tenn. 2001), which involved the crime of aggravated arson, rather than Imfeld, which involved several aggravated assault offenses, each of which was committed against a specific, named victim. In Lewis, a "victim" is defined, for purposes of enhancement factor (3), as a person (or entity) who is "injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." Id. at 508, (quoting State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994)). That definition would not include the four-year-old daughter in this case. However, we note that it is quite possible for an aggravated burglary to occur without any victim being injured, killed, or having any property stolen or destroyed, but the inhabitants of the burglarized habitation are clearly victims of the crime. Therefore, we do not interpret the Lewis definition of "victim" as being all-inclusive. Under the facts of this case, with the four-year-old daughter being an inhabitant of the apartment, and particularly since she was present when the aggravated burglary occurred, we believe that the trial court properly applied enhancement factor (3) to the Defendant's sentence for aggravated burglary.

Having concluded that the Defendant's four-year-old daughter was a victim in the aggravated burglary case, we must now review the trial court's application of enhancement factor (4) to the aggravated burglary conviction. As previously noted, enhancement factor (4) states that "[a] victim of the offense was particularly vulnerable because of age . . . ." Tenn. Code Ann. § 40-35-114(4). Whether a victim is "particularly vulnerable" for purposes of enhancement factor (4) is a factual issue to be resolved by the trier of fact on a case by case basis. State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). The application of enhancement factor (4) would be appropriate in this case if the facts show that the Defendant's daughter's age had some bearing on or some logical connection to "an inability to resist the crime, summon help, or testify at a later date." Poole, 945 S.W.2d at 96. A victim's youth does not necessarily equate with vulnerability. Id. The State is required to present evidence in addition to the victim's age to establish particular vulnerability; however, that evidence "need not be extensive." Id. at 97. Also, a court may consider the natural vulnerabilities attendant to the extreme ends of the aging spectrum by giving "additional weight . . . to the age of the victim in those cases where a victim is extremely young or old." Id. In our view, the record in this case does not contain sufficient evidence in addition to the age of the victim to support the application of enhancement factor (4).

We further conclude that enhancement factor (8), that the Defendant had "a previous history of unwillingness to comply with the conditions of a sentence involving release in the community," id. § 40-35-114(8), was erroneously applied in this case. Although the Defendant was released on

-11-

bond at the time he committed the crime of evading arrest in this case, we find no evidence in the record that the Defendant did not comply with the conditions of a <u>sentence</u> involving release in the community.

Finally, we conclude that enhancement factor (11) was improperly applied in this case. Enhancement factor (11) provides: "The felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury . . . ." <u>Id.</u> § 40-35-114(11). Although the record indicates that the Defendant committed aggravated assault in 1992 by "ramming" his vehicle into a police officer's vehicle, no proof is included in the record that the 1992 aggravated assault resulted in death or bodily injury. Thus, we conclude that enhancement factor (11) is not supported by proof in the record and was erroneously applied. Nevertheless, we conclude that the enhancement factors that are applicable in this case, along with the absence of any substantial mitigating factors, support the trial court's decision to impose sentences of incarceration.

## C. ALTERNATIVE SENTENCING

The Defendant next argues that the trial court should have granted him some form of alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "the trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing . . . and that a sentence other than incarceration would result in successful rehabilitation . . . ." <u>State v. Byrd</u>, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993) (citation omitted); <u>see also</u> Tenn. Code Ann. § 40-35-303(a). The Defendant, as a standard offender convicted of a Class C felony, <u>see</u> Tenn. Code Ann. § 39-14-403(b), and two Class A misdemeanors, <u>see id.</u> §§ 39-13-101(b), 39-16-603(a)(3), is presumed to be a favorable candidate for alternative sentencing.

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. <u>See</u> <u>State v. Taylor</u>, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing <u>Moss</u>, 727 S.W.2d at 235). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

Although the Defendant in this case is presumed to be a favorable candidate for alternative sentencing, see Tenn. Code Ann. § 40-35-102(6), the Defendant's presentence report and testimony offered at the sentencing hearing indicate a lengthy history of criminal conduct. Because of the Defendant's criminal record, we conclude that the trial court did not err by denying alternative sentencing in this case.

## D. CONSECUTIVE SENTENCING

Finally, the Defendant contends that the trial court erred by ordering him to serve his sentences consecutively. The trial court ordered that the Defendant's sentence for evading arrest be served consecutively to his concurrent sentences for aggravated burglary and assault in this case. As previously noted, indictment 234557, in which the Defendant is charged with evading arrest, is not properly before us in this appeal. However, we believe that the evidence in the record before us supports the trial court's decision to order consecutive sentencing.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that

(1) the defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) the defendant is an offender whose record of criminal activity is extensive;

(3) the defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) the defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising

-13-

from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity; the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

       (6) the defendant is sentenced for an offense committed while on probation; or

       (7) the defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7).

At the conclusion of the sentencing hearing, the trial court concluded that the Defendant is a "dangerous offender," id. § 40-35-115(b)(4), stating, "He's a dangerous individual to himself and now I think that there's no question that he is a threat to the safety of others, especially the small child." However, if the court concludes that a defendant is a dangerous offender under Tennessee Code Annotated § 40-35-115(b)(4), it must make two further determinations in addition to applying general sentencing principles. Imfeld, 70 S.W.3d at 708. First, it must find an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Although the trial court failed to make such determinations in this case, our de novo review reveals that the evidence supports a finding that both of the Wilkerson prongs apply. See id. Furthermore, as previously stated, we conclude that the Defendant "is an offender whose record of criminal activity is extensive." Id. § 40-35-115(b)(2). For these reasons, we conclude that the trial court did not err by ordering the Defendant to serve his sentence for evading arrest consecutive to the other two sentences in this case.

Accordingly, we AFFIRM the judgments of the trial court.

 

                                         _____

                                         ROBERT W. WEDEMEYER, JUDGE