IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 26, 2002

## STATE OF TENNESSEE v. KENNETH R. LAWS

**Direct Appeal from the Criminal Court for Washington County**
**No. 25663      Robert E. Cupp, Judge**

---

**No. E2001-00375-CCA-R3-CD**
**November 13, 2002**

---

The Defendant was charged with aggravated child abuse, a Class A felony. Pursuant to a plea agreement, the Defendant entered a "best interest" plea to abuse of a child under six years of age, a Class D felony, and the trial court sentenced the Defendant to a three-year term with the manner of service of the sentence to be determined following a sentencing hearing. Following a hearing, the trial court ordered the Defendant to serve the three-year sentence in the Tennessee Department of Correction. The Defendant now appeals, arguing that the trial court abused its discretion in denying judicial diversion and erred in denying alternative sentencing. We conclude that the record supports the trial court's denial of judicial diversion and alternative sentencing. Therefore, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Ivan M. Lilly, Assistant District Public Defender, Johnson City, Tennessee, for the appellant, Kenneth R. Laws.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Steve Finney, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Procedural History

The Washington County Grand Jury returned a presentment against the Defendant, Kenneth R. Laws, charging him with aggravated child abuse, a Class A felony. The Defendant entered a "best

interest plea"[1] to an amended charge of abuse of a child under six years of age, a Class D felony. Pursuant to the plea agreement, the Defendant received a three-year sentence, with the understanding that the Defendant would be applying for judicial diversion. Following a hearing, the trial court denied judicial diversion and alternative sentencing and ordered the Defendant to serve his three-year sentence in confinement. This appeal ensued.

## FACTS

At the sentencing hearing, the following testimony and evidence were presented: Debra Whitson, a registered nurse with twenty-two years' experience, testified that she specializes in emergency, intensive care, and flight nursing. Whitson reported that she was on duty at the Johnson City Medical Center on the night of September 19, 1999, when a call came in concerning a child who was the apparent victim of a drowning. Whitson stated that a helicopter was requested, but by the time the paramedics arrived at the scene, the victim, a three-year-old girl, had regained consciousness, and the helicopter was canceled. Whitson later observed a paramedic carrying the victim into the emergency room wrapped in a partially wet sheet. According to Whitson, the victim had wet hair and was "kind of drowsy[.]" Whitson recalled that the victim "would go to sleep for a little while and then she would wake up crying. But initially . . . she came in kind of moaning and crying a little bit." Whitson also recalled that "on three separate occasions within a short period of time," the child told her that "Kenny" had hurt her.

Whitson observed that the victim "had tufts of hair pulled out in three . . . places" and that one larger patch of hair was missing from the back of her head. Whitson opined that someone had pulled out the child's hair. Whitson also observed "multiple bruises all over [the victim's] ear space, on the soft parts of her ears, down her neck. She had a very distinct imprint of a hand that was across the front of her face . . . the size of an adult [hand]." Whitson testified that "the rest of [the victim's] body was covered with bruises that were too numerous to count." Whitson elaborated that "there was not a part of that child's body that you could lay a fifty cent piece on that would not touch a bruise, and they were in various stages of healing. She had a large fresh swollen . . . hematoma on her forehead, just yellow, green brown bruises all over." Whitson also observed two areas "that were blistered and were consistent with cigarette burns." Whitson identified photographs of the victim taken at the hospital. She stated that it looked as if one of the bruises "might have come from being kicked." Whitson testified that in her experience she had seen only one other child as badly bruised as this child, and that child was not alive.

On cross-examination, Whitson testified that on the night of the incident, the victim's grandfather told her that the victim had a bleeding or bruising disorder. Whitson testified that she examined the victim's old hospital records, which indicated that a panel of tests had been run on the victim, but no bleeding or bruising disorders had been discovered. Whitson acknowledged that some disorders, such as hemophilia, and some medications, such as those given to induce thinning of the blood, may cause bruising. She also stated that there could be other causes of bleeding disorders of

---

[1] See generally North Carolina v. Alford, 400 U.S. 25 (1970).

which she was not aware. Whitson testified that she asked the victim if someone had hurt her, and the victim responded by repeating the name, "Kenny." Whitson stated that the victim also "clinched her fists and . . . made beating motions at herself." When asked if the victim could have interpreted the Defendant's attempts to perform CPR on her as being attempts to hurt her, Whitson testified that the victim would have been unconscious and would not have been able to identify the person performing CPR on her. Finally, Whitson opined that the bruising she saw on the victim was not caused by a bruising disease or by someone performing CPR, but was, rather, "the textbook pattern for long-term consistent child abuse."

Dr. Robert Treece, a practicing pediatrician, testified that on the day of the hearing he examined the victim and found no bruising. He testified that he had reviewed the victim's medical records. He stated that in June 1999, a panel of tests were run on the victim, and all of the victim's results were within normal ranges. During his testimony, Dr. Treece reviewed the photographs taken at the emergency room on September 19, 1999 and testified that the bruising on the victim was not consistent with falling. Although Dr. Treece testified that toddlers often have bruises on their legs and knees, he opined that the bruises in the photographs could only have been caused by physical abuse.

On cross-examination, Dr. Treece testified that some bleeding problems that can cause bruising have a genetic basis. Dr. Treece testified that some medications can cause bleeding problems, and consequently, bruising. Dr. Treece stated that antibiotics such as penicillin and amoxicillin were not likely to cause bruising, although they could cause mucosal bleeding. Dr. Treece stated that a vitamin deficiency or a clotting disorder could cause bruising. He did not know if the victim had been tested for a vitamin K deficiency.

Dr. Treece testified that it would be "pretty far fetched to link . . . lice treatments and a vitamin deficiency together to cause hair loss." Dr. Treece stated that he did not know if multiple applications of lice medication would cause hair loss. He acknowledged that there could be many causes of alopecia (hair loss) other than trauma, including stress and hypothyroidism. He testified that he had never seen a child suffer hair loss as a result of stress. Dr. Treece testified that a severe tinea fungal infection of the scalp could cause hair loss in specific areas, but patches of hair loss are "usually more consistent with the hair being pulled out." Dr. Treece noted that although the Defendant had a low potassium level in June 1999, he did not believe that the victim's bruises were caused by a potassium deficiency.

Sergeant Tom Frayer of the Washington County Sheriff's Office testified that he investigates child abuse cases and that this case was referred to him by the Department of Human Services (DHS). According to Sgt. Frayer, emergency room personnel notified DHS that this was a potential child abuse case. Sgt. Frayer testified that his investigation showed that the victim had fallen while she was in the bathtub taking a bath and that she had become unconscious as a result of a fall. He testified that the tape of the 911 call indicated that the emergency operator gave clear instructions to Ms. Jasmine Green, the victim's aunt and the Defendant's girlfriend, on performing CPR, but Green did a poor job relaying those instructions to the Defendant because she seemed to be

"hysterical." Sgt. Frayer identified the photographs he had taken of the bathtub where the victim had fallen. Sgt. Frayer stated that on the day after the victim was admitted to the hospital, he and Rita Parris of DHS interviewed the victim while she was in intensive care. He testified that he asked the victim what had happened, and the victim told him, "Kenny beat my ass." According to Frayer, when asked why she took a bath at eleven o'clock at night, the victim stated that she took the bath "to take away the bruises."

On cross-examination, Sgt. Frayer testified that the Defendant gave a statement concerning the incident voluntarily, was cooperative, and tried to answer the questions asked. Sgt. Frayer made an audio tape of the Defendant's statement, and both the tape and the transcription of the tape were entered into evidence.

According to Sgt. Frayer, the Defendant, in his statement, explained that the victim "was kind of a disruptive child at times" and that she bruised "real easy." Sgt. Frayer testified that he showed the Defendant various photographs of the victim's bruises, and the Defendant explained each one. Sgt. Frayer testified that the Defendant claimed that he did not know how the victim got a black eye because he was not in the room when it happened. Regarding another bruise, the Defendant stated that the victim fell in the bathroom. Sgt. Frayer testified that the Defendant also told him that some of the victim's bruises were the result of the victim hurting herself. Sgt. Frayer recalled that the Defendant stated that on one occasion, the Defendant put his hand over the victim's mouth and held her up against a wall to force her to stop screaming. Regarding bruises on the victim's hip, Sgt. Frayer reported that the Defendant claimed that the victim would open and close the bathroom door with her hip. Sgt. Frayer testified that the Defendant told him that the hematoma on the victim's head probably came from falling in the bathtub or during CPR.

Sgt. Frayer noted that the Defendant acknowledged that he "lost [his] temper." According to Sgt. Frayer, the Defendant stated, "I got to the point where I got so mad when she kept doing things."

Jasmine Green testified that she is the victim's aunt and that her sister, Lisa, is the victim's mother. Ms. Green testified that on September 19, 1999, the victim was in the custody of her father, Raymond Green. She stated that Raymond Green had custody of the victim because the victim's mother "was having some trouble with medication." Ms. Green stated she knew that the victim had frequently been to the doctor. She recalled that the victim's mother took the victim to a doctor for either a low platelet or white blood cell count. Ms. Green stated that the victim also had a history of reflux problems that started when she was a couple of months old. According to Ms. Green, the reflux would cause the victim to "stop breathing and turn blue."

Ms. Green testified that the victim bruised very easily. Ms. Green stated that as early as the victim's third birthday, she observed bruises on the child. She stated that it was her understanding that the bruising was caused by the victim biting herself, although she had never seen this happen. Ms. Green recalled that the victim had bruises on her when she went to live with Raymond Green, and she stated that Mr. Green had taken the victim to the doctor about those bruises shortly after he

obtained custody. Ms. Green testified that she watched the victim play with the Defendant's daughter, Emily, and she maintained that although the two girls would do the same things, the victim would bruise, but Emily would not. Ms. Green testified that the victim had problems with lice throughout a summer that the victim spent with her grandfather. She testified that while the victim had lice, her hair would fall out in "handfuls."

Ms. Green testified that the victim stayed at her grandfather's house, but spent a lot of time with Ms. Green and the Defendant, especially the four to five days a week when Emily was there. She described their activities on September 19, 1999, as follows: that afternoon, Ms. Green, the Defendant, Emily, and the victim went to a birthday party for Ms. Green's three-year-old cousin. While there, the victim and the other children played in a creek. When they left the party to take Emily back to her mother, they stopped by the home of Ms. Green and the Defendant, dropped off the victim and left her in the care of Ms. Green's cousin's boyfriend, Kirk. That evening, Ms. Green and the Defendant went to a funeral. Again, Kirk watched the victim.

Ms. Green testified that the victim spent the night with her and the Defendant that evening and that due to the funeral, the victim was late getting her bath. Ms. Green stated that she ran the victim's bath water and remained in the bathroom with the victim while she was bathing. She recalled that the Defendant was in the kitchen. According to Ms. Green, while the victim was in the tub splashing around, she suddenly burped "really loud." Ms. Green thought the victim looked like she was about to be sick so she told her to get out of the tub. Ms. Green stated that as soon as the victim stood up, her eyes rolled back and she fell backwards, hitting the back of the bathtub. She testified that the victim belched three times before falling.

Ms. Green testified that the Defendant heard the fall, ran into the bathroom, and grabbed the victim to see what he could do. Ms. Green observed that the victim was wet, unconscious, not breathing, and blue. Ms. Green testified that she went to call 911 and that she told Kirk, who had remained at their house, to go to her father's house and get him. She stated that after she dialed 911, she heard someone say, "Call Ray," so she hung up and called her father. Ms. Green testified that after calling her parents, 911 called her back. Ms. Green stayed on the phone with the 911 dispatcher until the paramedics arrived. Ms. Green stated that she had trouble relaying to the Defendant the instructions that the dispatcher was giving her because she was so excited. She testified that the Defendant was with the victim the whole time, "breathing in her mouth . . . and pushing on her chest and stuff, trying to make her breathe." Ms. Green testified that the victim had vomited and was biting her tongue, so the Defendant had his hands in her mouth trying to clear it and to keep her from biting her tongue.

Ms. Green testified that when her father arrived, he tried to help by holding the victim's head still. Ms. Green stated that some time before the paramedics arrived, the victim began to scream and cry, so Ms. Green knew the child had started to breathe on her own. She stated that when the emergency rescue squad arrived, they came into the house, found that the victim was breathing, went out to get their gear, came back in, wrapped the victim up, and took her to the hospital. Ms. Green

testified that her father went to the hospital with the victim and that she and the Defendant also drove to the hospital.

Ms. Green testified that she has a son, Andrew, by the Defendant. She testified that they all live together and that the Defendant is their sole provider. She also stated that the Defendant supports his daughter, Emily, from a previous relationship. Ms. Green maintained that the Defendant is a great parent, that he plays with his children, and that he shows no favoritism. She also testified that she has never seen the Defendant do anything to harm any of the children, nor has she ever seen him lose his temper with them.

On cross-examination, Ms. Green testified that she believed the bruise on the victim's hip was caused by the way the child habitually pushed open a door and that the bruises on her back were caused by her falling down the back steps and by scooting down the carpeted steps inside the house. She stated that she had been told that the victim had fallen off the toilet the night before this incident, but she was not certain about what head injuries she may have obtained from the fall. Ms. Green testified that the marks on the victim's face could have been caused while CPR was being administered. Ms. Green testified that when the victim got into the tub on the night of the emergency, she had bruises on her body, including bruises on her leg and hip, some on her back, a couple on her face, and a lot on her arms and legs. However, Ms. Green did not recall a big hand print on the victim's face. She also could not explain the hematoma on the victim's forehead because she had testified that the child had fallen backwards in the tub. Ms. Green testified that the victim did not have any bruising on her chest, despite the Defendant pushing on it "hard" during CPR.

Raymond Green testified that he is the father of Jasmine Green and Lisa Elrod and that he is the victim's grandfather. He stated that he obtained custody of the victim in June 1999, and he noticed bruising on the victim that he believed was a result of a recent car accident. He testified that at that time, the victim was taking amoxicillin, Benadryl, and PediaCare, but he later stopped giving her the PediaCare on the advice of someone at the hospital.

Mr. Green stated that when he first obtained custody of the victim, she was very clumsy and would walk into tables "like she was a little dizzy." According to Mr. Green, the victim had tubes in her ears which he thought might have had something to do with the clumsiness. He observed that the victim would frequently walk into things and that she would fall a lot, resulting in bruises. Mr. Green testified that the victim also received bruises just from playing. He stated that when he took the victim to a doctor, she got a bruise from the doctor examining her. He testified that he saw the victim open doors, including the bathroom door that sticks, with her hip.

Mr. Green testified that on December 21, 1999, after the emergency incident, the victim went to live with her natural parents on a temporary basis, although Mr. Green retained legal custody. Mr. Green stated that he saw bruising on the victim, including bruises on her shins and on her back, even after she returned to her parents' home. He introduced into evidence a photograph of bruises on her shin, and a photograph which was intended to show a bruise on her back.

Mr. Green testified that on the night of September 19, 1999, he went to bed early and was awakened by his wife screaming that the victim had drowned in the bathtub. He stated that he quickly dressed and went to his daughter's home which was located near his home. Mr. Green recalled that Jasmine Green was on the phone when he arrived. Mr. Green testified that the victim was laying on her side in the bathroom, and he thought that she was dead. Mr. Green testified that he tried to help by holding the victim's head so that she would not choke on her own vomit. He observed the Defendant holding the child's tongue. Mr. Green testified that he did not observe any marks on the victim's head when he first went into the bathroom. He recalled that the victim looked very pale.

Mr. Green testified that he had observed the Defendant around the victim and around the Defendant's own children, Emily and Andrew. In Mr. Green's opinion, the Defendant was a good parent figure to all of the children. Mr. Green testified that the Defendant treated all of the children equally. He stated that he never saw the Defendant lose his temper with the children or do anything inappropriate in their presence. He also stated he was shocked when he heard that the Defendant had been arrested.

Mr. Green testified that while the victim was in the hospital, he talked to her about the bruises on her body. According to Mr. Green, the victim told him that she had received the bruises in various ways, such as falling down the stairs. He also stated that the victim told him that she "fell on the can." He reported that the victim never told him that anyone had hit her. However, when questioned by the trial court, Mr. Green admitted that the amount of bruising he saw on the victim on September 19, 1999 shocked him and that he did not think that falling down the stairs could have caused all of the bruising that he saw.

Tracy Michelle Bacon testified that the Defendant is the father of her daughter, Emily. She testified that the Defendant has supported Emily since birth and that he has been a "really good" father. Bacon claimed that she had never seen him do anything inappropriate with her daughter. She testified that she had seen the victim several times, and she noted that the victim seemed to be fine around the Defendant. She specified that the victim "didn't seem like she was scared or anything." Bacon testified that she had seen the victim pinch herself, leaving tiny bruises on her arms.

Fred Lamar Maze testified that at the time of the hearing, he had been Tracy Bacon's boyfriend for about nine or ten months. He stated that during that time, he had observed the Defendant around Emily and believed that "their relationship is great." Maze testified that he never saw the Defendant act inappropriately toward Emily or any other child.

Darlene Green testified that she is the mother of Jasmine Green and the wife of Raymond Green. Mrs. Green reported that she had known the Defendant since he began dating her daughter, Jasmine. She testified that the victim was "always getting bruises . . . every time she would bump into something, every time somebody would just touch her . . . ." Mrs. Green stated that she had observed the Defendant around the victim, Emily, and Andrew, and she maintained that he was a "perfectly normal" parent figure. According to Mrs. Green, "He played with them and . . . he helped

feed them. He helped them . . . in every way that a parent would." She testified that the Defendant is the sole provider for Jasmine Green and their son, Andrew, and that he also provides child support for Emily. Mrs. Green testified that she had never seen the Defendant do anything inappropriate around any child. She stated, "[A]ll I've ever seen him do was make them stand in the corner, and other than that, I guess him playing with them a lot. I mean, you know, they might play rough but nothing that would be, like, intentionally hurting them."

Mrs. Green testified that on the night of September 19, 1999, she was still awake when Kirk came to the door and told her that the victim had drowned in the bathtub. Mrs. Green testified that she woke her husband, and she walked to the Defendant's house while her husband got dressed and drove over. She reported that when she arrived, the Defendant was in the bathroom with the victim. She stated that she knew the Defendant had some CPR training, so she just stayed out of the way. Mrs. Green testified that the victim was laying on her side with her back turned to Mrs. Green, so she could not see much. After the paramedics arrived, Mrs. Green drove to the hospital.

Mrs. Green testified that when the victim stayed at her house, she was the one who usually bathed her. She reported that prior to that evening, she had observed bruises on the victim like the ones in the photographs "on and off . . . depending on what she had been doing." Mrs. Green testified that she would ask the victim about the bruises, and the victim would always tell her what had happened. Mrs. Green stated that the victim's explanations always seemed reasonable to her because she knew the victim bruised easily. Mrs. Green claimed that the victim got bruises "just all the time." She testified that the victim only got hematomas "maybe once or twice."

The Defendant testified that he stood by the statement he voluntarily gave to Sgt. Frayer, but he felt that he was rushed through his answers and that he was cut off while trying to answer. The Defendant stated that he thought he had a "pretty good relationship" with the victim. He testified that the victim would "have her bad days and [they] just tried to work through that."

He described the events of September 19, 1999, as follows: After attending a funeral, he and Jasmine Green took his daughter, Emily, home to her mother. The Defendant recalled that once he and Jasmine Green got home, he began cooking dinner. According to the Defendant, he asked the victim if she needed to go to the restroom. He testified that the victim responded affirmatively, so he took her into the bathroom and began to run her bath water. The Defendant testified that by the time the victim had finished urinating, Jasmine Green had come into the bathroom. The Defendant testified that he was in the kitchen when he heard Jasmine Green tell the victim to get out of the bathtub. According to the Defendant, he went into the bathroom and saw the victim "laying there."

The Defendant testified that the victim was turning blue. He stated that he pushed Jasmine Green out of the way and got the victim out of the bathtub. The Defendant reported that the victim was "really clammy." He stated that as he was moving the victim, her body hit the bathroom door. The Defendant testified that he checked the victim for a pulse and then began CPR. He specified, "I was patting her, beating on her back." The Defendant recalled that he yelled, "Call 911. Call Ray." He stated that he put his hand in the victim's mouth so she could not bite her tongue. The

Defendant then noticed the victim take a couple of deep breaths. He testified that when Raymond Green arrived, Green held the victim's head, and the Defendant held her body because she was "jerking." He testified that the victim had vomited, and he recalled that she had reflux. The Defendant testified that when the victim "came around," she began screaming.

The Defendant testified that on the day after the victim went into the hospital, Sgt. Frayer and Rita Parris came to his home and took photographs of the bathroom. Then the Defendant agreed to go to "the courthouse" where he was shown other photographs. The Defendant testified that he told Sgt. Frayer what he knew about the pictures that he was shown. The court questioned the Defendant about the amount of time that the victim spent at his house, but the Defendant denied that he actually kept the child full-time. He stated that she came to his house four or five days a week, but only spent the night two or three times a week.

The Defendant testified that "when you'd pick [the victim] up, she'd bruise." The Defendant admitted that he put the hand print on the victim's forehead. He recalled that she had come from her parent's home and was upset. The Defendant testified that the victim yelled, "I hate you. I hate you." He stated that the victim then "threw herself through one of [his] bedroom walls which [was] . . . covered . . . in styrofoam." He stated that the victim "just went crazy" and that "she kept throwing herself against walls and throwing herself on the floor." The Defendant testified that he finally had to "just basically hold her down cause she was actually hurting herself."

The Defendant testified that his only prior conviction was for driving on a suspended license. He testified that he is the sole provider for Jasmine Green and their son. He reported that he and Jasmine Green planned to marry but were financially unable to do so at that time. He also testified as to his employment record. The Defendant testified that he worked steadily even though he had to change jobs for various reasons, including reasons related to these charges. The employment problems related to these charges included missing work for court appearances and his conviction prohibiting him from selling alcohol as part of his duties while working at a gas station. The Defendant anticipated losing his current job because of excessive time spent in court appearances, but he stated that he already had an offer for another job where he had previously worked.

The trial court inquired as to why the Defendant indicated in his statement that a doctor had told him to use Epsom salts on the victim to help with bruising when he could not have taken the victim to a doctor because the Defendant did not have custody of the victim. The Defendant admitted that he had lied about taking the victim to the doctor and stated that the information had actually come from Raymond Green. The Defendant was questioned by the Court about saying "I'm going to whoop your ass" to the victim. The Defendant responded that the victim was familiar with the phrase because they used it while playing a game. He denied telling Sgt. Frayer that he told the victim, "I'm going to whip your ass if you don't quit [chewing your lip]." When the Court read the Defendant's statement back to him, he replied, "Well, I might have said it a few times."

The trial court noted that the Defendant admitted to giving the victim "at least one spanking a day," even though he knew that she bruised easily. However, the Defendant maintained that he

would "barely tap her on the bottom." When asked by the court if the victim's "hind end" stayed bruised all of the time, the Defendant replied in the negative. The trial court then asked how the victim, who bruised so easily, could be spanked everyday and not have her "hind end" stay bruised. The Defendant testified that he did not check her "hind end" that often. The Defendant maintained that he could spank the victim and not cause a bruise, but that just touching her would cause a bruise. The trial court questioned the Defendant about his claims that he held the victim down only to keep her from hurting herself or from hurting him. The Defendant testified that he would walk away from the victim when he lost his temper. However, when the court noted that he had, in fact, indicated in his statement that he would restrain the victim when he lost his temper, the Defendant stated that he only restrained her when she was hurting herself.

## II. ANALYSIS

### A. Transcript of Plea

Initially, we note that the record before this Court does not include the transcript of the Alford plea hearing. Any evidence presented at that hearing should be considered in determining the appropriate sentence. See Tenn. Code Ann. § 40-35-210(b)(1). Further, it is the duty of the defendant to prepare a fair, accurate, and complete record on appeal to enable meaningful appellate review. Tenn. R. App. P. 24(b). This Court has held that because it is during the guilty plea hearing that the State is allowed the opportunity to present the facts underlying the offense, "a transcript of the guilty plea hearing is often (if not always) needed in order to conduct a proper review of the sentence imposed." State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999). Failure to insure that the record before this Court conveys a fair, accurate, and complete account of what transpired in the court below concerning sentencing issues results in a waiver of such issues and a presumption that the trial court's sentencing determinations are correct. State v. Robinson, 73 S.W.3d 136, 154 (Tenn. Crim. App. 2001). In any event, the record before us supports the trial court's sentencing determinations.

### B. Judicial Diversion

The Defendant argues that the trial court abused its discretion in declining to impose a sentence pursuant to Tennessee Code Annotated § 40-35-313, commonly referred to as judicial diversion. According to this statute, the trial court may, in its discretion, following a determination of guilt, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who pleads guilty or is found guilty of a misdemeanor or a Class C, D or E felony; who has not previously been convicted of a felony or a Class A misdemeanor; and who is not seeking deferral for a sexual offense or a Class A or Class B felony. Id. § 40-35-313(a)(1)(B)(I)(a)(c); State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App.1996).

When a defendant contends that the trial court committed error in refusing to grant judicial diversion, this Court must determine whether the trial court abused its discretion in failing to

sentence pursuant to the statute. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App.1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). Judicial diversion is similar to pretrial diversion; however, judicial diversion follows a determination of guilt, and the decision to grant judicial diversion is initiated by the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). When a defendant challenges the trial court's denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958. As this Court stated in Anderson,

> [w]e conclude that judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under Tennessee Code Annotated § 40-15-105. Therefore, upon review, if "any substantial evidence to support the refusal" exists in the record, we will give the trial court the benefit of its discretion. Only an abuse of that discretion will allow us to overturn the trial court.

857 S.W.2d at 572 (citation omitted).

The criteria that the trial court must consider in determining whether a qualified defendant should be granted judicial diversion include the following: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. Cutshaw, 967 S.W.2d at 343-44; Parker, 932 S.W.2d at 958. An additional consideration is whether judicial diversion will serve the ends of justice, i.e., the interests of the public as well as the defendant. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App.1993). Moreover, the record must reflect that the court has weighed all of the factors in reaching its determination. Bonestel, 871 S.W.2d at 168 (citations omitted). The court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others. Id.

We conclude that the trial court did not abuse its discretion in denying judicial diversion. Although the Defendant contends that the trial court failed to consider the issue of judicial diversion, the record does not support the Defendant's claim that the trial court abused its discretion. Specifically, the Defendant claims the trial court failed to consider the appropriate factors and failed to articulate its reasons for denying the Defendant judicial diversion. The record clearly contradicts this claim. In a lengthy oral opinion, the trial court addressed all the factors particularly applicable to judicial diversion as directed by case law. The court concluded that "there's ample evidence in this record to find that this defendant is not amenable to rehabilitation." The trial court evaluated the circumstances of the offense and found them to be horrifying, shocking, reprehensible and excessive. The trial court acknowledged that the Defendant did not have a criminal record and that his employment history works in his favor.

-11-

The Defendant asserts that his social history favors judicial diversion because he was a good father to his own children, because he provided child support to the mother of his three-year-old daughter, and because he was the sole provider for his infant son and that son's mother. Contrary to this assertion, the trial court found that the Defendant's social history "leaves something to be desired" because he "continuously brings young children into this . . . world, and he simply doesn't marry the women that . . . bear[] those children for him." The court rejected the Defendant's claim that he has not married the woman with whom he now lives because of financial reasons.

The trial court found a need for deterrence in this case. It observed that the victim in this case was at risk because the entire family helped to cover up the abuse, and that abuse might not have been discovered but for the emergency in the bathtub on the night of September 19, 1999. The trial court also noted the seriousness of the problem of child abuse in the community, as evidenced by the statistics generated by the Child Abuse Investigation Unit concerning the number of cases handled each year.

The Defendant further argues that the trial court improperly relied on the Defendant's lack of remorse in denying judicial diversion. Again, the record clearly does not support this claim. The trial court did refer to the Defendant's lack of remorse, but only to note that had the Defendant shown remorse for his conduct, such remorse may have been a mitigating factor. The trial court never intimated that it was using lack of remorse as a reason for denying judicial diversion. However, the trial court did consider the Defendant's lack of candor. This Court has held that a trial court may consider a defendant's failure to accept responsibility for an offense in determining the potential for rehabilitation. State v. Anderson, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992).

The record contains substantial evidence supporting the trial court's decision to deny judicial diversion, and we find no abuse of discretion by the trial court in denying judicial diversion. This issue is without merit.

## C. Alternative Sentencing

The Defendant also challenges the trial court's order that he serve his entire three-year sentence in the Tennessee Department of Correction. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the

sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

Specifically, the Defendant argues that he should have been granted some form of alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a

-13-

favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a). The Defendant, as a standard offender convicted of a Class D felony, see Tenn. Code Ann. § 39-15-401(a), is presumed to be a favorable candidate for alternative sentencing.

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing Moss, 727 S.W.2d at 235). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant .
> . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); see also State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

The trial court carefully evaluated the evidence before reaching its conclusions. The record indicates that the trial court considered the victim's medical records, photographs of the victim, the testimony at the sentencing hearing, and the Defendant's recorded and transcribed statement. The trial court also made numerous references to information contained in the presentence report, including the Defendant's age, weight, and size, his lack of a prior criminal record, his family information, and his employment history.

In sentencing the Defendant, the trial court found that the Defendant did not have a criminal history, and that the Defendant does work steadily. The trial court noted that the Defendant's "lack of credibility is an appropriate consideration and reflects on his potential for rehabilitation." According to the trial court, "[T]his [D]efendant lied," and the family covered up the lies. The trial court observed that it was evident that the victim was "bruised from head to toe." Thus, the trial court weighed the Defendant's lack of candor heavily. The trial court stated that despite testimony to the contrary, it was clear that the victim was living with the Defendant. The trial court pointed

out various discrepancies in the Defendant's testimony as to how the victim became bruised. The trial court found that the Defendant, as well as the family members who testified on behalf of the Defendant, lacked credibility. Thus, the trial court found that the Defendant lacked the potential for rehabilitation.

The trial court found that the presumption that the Defendant was a favorable candidate for alternative sentencing was rebutted based on the need to avoid depreciating the seriousness of the crime and that confinement is particularly appropriate to effectively deter others likely to commit similar offenses. See Tenn. Code. Ann. § 40-35-103(1)(B).

Regarding enhancement factors, the trial court found that the Defendant has a previous history of criminal behavior in addition to that necessary to establish the appropriate range. See Tenn. Code Ann. § 40-35-114(1). The trial court found that "[f]rom the time this child's been in [the Defendant's] custody, he's beat on her, he's slapped her, he's spanked her, he's lost his temper . . . ." The trial court found that due to the "overwhelming" amount of bruises on the victim, the personal injuries inflicted on the victim were particularly great. See id. § 40-35-114(6). Finally, the trial court found that the Defendant had no hesitation about committing a crime when the risk to human life was high. See id. § 40-35-114(10). In applying enhancing factor (10), the trial court noted that the victim was a forty-four-month-old child and that the Defendant was a six foot tall, 198 pound man.

The trial court noted that the Defendant never showed any remorse for his actions. The trial court found that the circumstances of the offense and the need to deter others weighed heavily against the Defendant. The trial court acknowledged that the injuries to the victim were "horrifying . . . reprehensible and . . . excessive."

The trial court found that based on Sgt. Frayer's testimony, the frequency of child abuse cases was increasing, and thus there was a need for deterrence. According to the trial court, the Defendant's behavior was "a continuing course of conduct" such that he had previously engaged in criminal conduct of the same type as the offense in question. The trial court found that there was ample evidence that the Defendant was not amenable to rehabilitation, and that the circumstances of the offense outweighed the other factors.

The record in this case clearly shows that the trial court properly considered the sentencing principles and guidelines, that it properly considered all the relevant facts and circumstances, and that its findings of fact are supported by the record. Accordingly, the judgment of the trial court is AFFIRMED.

 

_____
ROBERT W. WEDEMEYER, JUDGE